UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| JOSEPH E. WALSH and ELIZABETH J. WALSH, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Case No. 4:16CV1451 HEA ) |
| G.E.A.R.S. and AUCTION HOLDINGS and ACQUISITIONS, INC., | ) ) ) ) |
| Defendants. | ) |

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion to Enforce Settlement, [Doc. No 67]. Plaintiffs filed this action in September 2016. And seek a sum sufficient to cover Plaintiffs' security interest in a 1959 Mercedes Benz, incidental and consequential damages, punitive damages and interest from defendants. For the reasons set forth below, Defendants have demonstrated by clear, convincing, and satisfactory evidence that the parties settled this dispute in its entirety on March 8, 2016. The Court will therefore grant Defendants' Motion to Enforce Settlement Agreement and order the parties to comply with the settlement agreement's terms.

### Background

This case arises from the sale of a vehicle. Defendant G.E.A.R.S. listed a 1959 Mercedes-Benz ("the Mercedes") for sale on eBay. Defendants sold the Mercedes to Plaintiffs for $125,000.00.

Plaintiff's First Amended complaint alleges Plaintiffs are residents of St. Louis County, Missouri, in this judicial district, Defendant Larry E. O'Hara, Jr. ("O'Hara") is a resident of Fayetteville, Georgia, trading and doing business as G.E.A.R.S a/k/a German & Exotic Auto Remarketing Specialists ("G.E.A.R.S."). O'Hara, G.E.A.R.S., and Auction Holdings and Acquisitions, Inc. engage in or have engaged in the repair, restoration, purchase, brokerage, and/or sale of automobiles and are therefore merchants under Mo. Rev. Stat. § 150.010.

Defendant G.E.A.R.S. is an unincorporated business with its principal place of business at 370 S. Glynn St., Fayetteville, GA, 30214. Defendant AUCTION HOLDINGS AND ACQUISITIONS, INC. ("AHA") is a Georgia corporation with its principal place of business at 370 S. Glynn St., Fayetteville, GA, 30214.

Defendants regularly transact business in Missouri, and in this judicial district, including, but not limited to, offering automobiles for sale at classic car auctions and/or online.

Defendants regularly transact business with Missouri residents, including

2

offering to sell, purchasing or brokering, and offering to purchase or broker, automobiles with Missouri residents, including residents of this judicial district.

This Court has personal jurisdiction over Defendants under both the Missouri long-arm statute and under the U.S. Constitution because, among other reasons: Defendants, as set forth more fully below, directed numerous false descriptions and misrepresentations and other tortious conduct to Plaintiffs in Saint Louis County, Missouri while knowing that such harmful conduct would be felt by Plaintiffs in Missouri; Defendants misappropriated funds while knowing that the effect of their tortious and wrongful conduct would be felt by Plaintiffs in Missouri; and Defendants have directed telephone and mail communications to Walsh in Missouri with the intent to induce Plaintiffs to take action within the State.

Defendants engage in or have engaged in the repair, restoration, purchase, brokerage, and/or sale of vintage cars, classics, hot rods, muscle cars and exotic automobiles. Defendants claim to be a "luxury and exotic auto remarketing firm specializing in wholesale and retail automotive remarketing solutions as well as direct order acquisitions."

Defendants advertise that "[i]n the retail market, our quality standards and services are simply unmatched. While the majority of retail units are secured via Pre-order, some are offered for sale online and in our facility."

3

Defendants also advertised on eBay and in *Hemmings,* a prominent and widely distributed Collector car publication, that it "provides prompt shipping / transportation solutions via several trusted vendors throughout the US and overseas."

On March 1, 2016, Defendants sold to Plaintiffs, for $125,000.00 what they described and represented to be a 1959 Mercedes-Benz W121190SL Roadster (the "1959 Mercedes"), having been "completely restored" 20 years ago and having, at all times since, been maintained in climate controlled storage in order to preserve it.

During negotiations for the purchase of the 1959 Mercedes, Defendants made multiple descriptions and representations to Walsh regarding the authenticity, pedigree, low original mileage, provenance, and "completely restored" status of the car. Among other things, Defendants assured Walsh that the car had been "completely restored" 20 years ago and had been kept in a climate controlled environment and out of inclement weather since then, and was in "outstanding" and "mint" condition with what defendants believed to be only 38,000 original miles.

The description of the car on eBay described: "The 548th car built by Mercedes-Benz in 1959, this rare survivor was, in addition to its complete restoration once in its lifetime by its prior collector owner of 20 years, recently

professionally refreshed while maintaining original vintage parts. Stored in a climate-controlled environment and has not been in any inclement weather since restoration. The car includes additional original parts and accessories, both Solex and Weber Carburetors (Weber Currently Mounted), Two sets of keys complete on vintage MB keyring(s), Owner's Manual, Complete Tool Kit and Wrap, Original Jack and spare as well as a 5th finished to match Wheel Cap."

The eBay description further stated: "This 190 of course runs and drives flawlessly, all gears operate smoothly and all systems/lights/radio, etc. function including the dash, courtesy and clearance lights.  The vintage Becker Mexico is operative inclusive of the intriguing auto search/scan operations and is partnered with the original vintage cloth wrapped speaker and housing.  In addition to cosmetics the G.E.A.R.S® team has insured the car is mechanically sorted inclusive of all fluids being flushed/changed during inspection/service. The car is on display on the dealership's showroom floor.  She of course gets far more attention than any of the exotics on display . . . regardless of make or price point.

The eBay description further stated:   "This is a rare find and there are no issues with this highly sought Mercedes-Benz. Yes, the car, interior, trunk and engine bay is [sic] that clean.  Aside from age/dust and some limited flaking the underneath maintains is [sic] finish from the prior restoration.  In the

5

operations of a well-respected remarketing firm in the European/exotics business for over 18 years this is one of the most perfect 190SL's we have ever experienced at this price point."

The G.E.A.R.S. website, which Walsh viewed prior to purchasing described the car as a 1959 Mercedes-Benz Wl21 190SL Roadster in "Outstanding Condition[]" including "20Yr Old Restoration" and "rare" from the "Reserve Collection."

Defendants further represented that there were only four things that needed attention in order to bring the 1959 Mercedes back to a very high standard following its complete restoration 20 years ago. Those four things were: (1) Chrome windshield surround was pitted and needed re-chroming; (2) Chrome rear-view mirror was pitted and needed to be re-chromed; (3) Chrome gas cap was pitted and needed to be re-chromed; and, (4) Shift knob was original and showed evidence of crazing/cracking.

After purchasing the vehicle, Walsh obtained an evaluation of the 1959 Mercedes and discovered that it was never "completely restored" 20 years ago as described by Defendants. Walsh discovered evidence indicating that the 1959 Mercedes had not actually ever undergone a complete restoration as described by Defendants. Among other things, Walsh discovered evidence that:

6

The car's frame is in original and not restored condition, and has never been media-blasted to bare metal as a restored car's frame would have been and shows substantial visible rust; the car's body shows rust in at least three locations that have been clumsily hidden by recent paint; the car's wiring is seen to be original in many places which is inconsistent with a "complete restoration;" the car's driver's door is not properly aligned with the body and is recessed in the door opening; the interior regions of both of the car's rear quarter panels/wheel wells (not visible from general exterior inspection) show very poor quality body work with brazed-in scrap metal supports and substantial amounts of Bondo-plastic body filler. This is antithetical to actual restoration-quality body work which would use very little if any filler.

In addition, Walsh discovered that Defendants had made further mis-descriptions regarding the 1959 Mercedes's condition, including his discoveries that: All gages do not work properly, in direct conflict with Defendants' representations. For example, the water gage and fuel gages do not work; and the engine does not start and run seamlessly, in direct conflict with Defendants' descriptions and representations. For example, the engine idles high at over 2000 rpms and the motor knocks under low load.

At no point prior to the sale was Walsh aware of, nor was Walsh made aware of, any of the defects or the nonconformities of the 1959 Mercedes, as

7

outlined herein.

At no point during Walsh's communications with Defendants prior to the sale of the 1959 Mercedes did Defendants make Walsh aware of the defects and the non-conformities of the 1959 Mercedes, as outlined herein.

Plaintiffs allege that the contract for sale of the Mercedes was formed when Defendants accepted the Walsh's bid on the Mercedes. The Mercedes was located in Fayetteville, Georgia at the time of the sale.

Plaintiffs allege breach of contract, breach of the duty of good faith and fair dealing, fraud, fraudulent concealment/nondisclosure, fraudulent inducement to contract, misrepresentation, breach of express warranties, breach of the implied warranty of merchantability, unjust enrichment, and violation of the Missouri Merchandising Practices Act against Defendants G.E.A.R.S. and Auction Holdings and Acquisitions, Inc.

## Discussion

"District courts have inherent power to enforce a settlement agreement as a matter of law when the terms are unambiguous." *Barry v. Barry*, 172 F.3d 1011, 1013 (8th Cir. 1999). A party moving to enforce must prove the existence of the settlement agreement by clear, convincing, and satisfactory evidence. *Matthes v. Wynkoop*, 435 S.W.3d 100, 106 (Mo. Ct. App. 2014). "Evidence is clear and convincing if it instantly tilt[s] the scales in the affirmative when weighed against

the evidence in opposition, [such that] the fact finder's mind is left with an abiding conviction that the evidence is true." *Id.* (internal quotation marks and citations omitted).

"In a diversity case, the settlement contract must be construed according to state law." *Barry*, 172 F.3d at 1013. The settlement discussions addressed matters that occurred in the Eastern District of Missouri, which is where Plaintiffs received the allegedly defective car and ultimately filed their lawsuit. The Court will therefore infer that that Missouri contract law applies to this dispute.

Under Missouri law, the essential elements of a valid settlement agreement are the involvement of parties who are competent to contract, a proper subject matter, legal consideration, mutuality of obligation, and mutuality of agreement. *Chaganti & Assocs., P.C. v. Nowotny*, 470 F.3d 1215, 1221 (8th Cir. 2006) (citing *L.B. v. State Comm. of Psychologists*, 912 S.W.2d 611, 617 (Mo. Ct. App. 1995)). "The creation of a valid settlement agreement requires a meeting of the minds and a mutual assent to the essential terms of the agreement." *St. Louis Union Station Holdings, Inc. v. Discovery Channel Store, Inc.*, 301 S.W.3d 549, 552 (Mo. Ct. App. 2009). A meeting of the minds or mutual assent is reached when the minds of the contracting parties meet upon and assent to the same thing in the same sense at the same time. *Grant v. Sears*, 379 S.W.3d 905, 916 (Mo. Ct. App. 2012). To determine whether there was mutuality or meeting of minds, the Court looks to the

9

parties' intentions as expressed or manifested in their words or acts, and not to their secret intentions. *Bath Junkie Branson, L.L.C. v. Bath Junkie, Inc.*, 528 F.3d 556, 561 (8th Cir. 2008) (quoting *Butler v. Missouri Ins. Co.*, 187 S.W.2d 56, 60 (Mo. Ct. App. 1945)); *Chaganti & Assocs.*, 470 F.3d at 1221.

The words and acts expressed by Joseph Walsh and Larry O'Hara in their conversation and email exchanges culminating in the March 8 Settlement Agreement show that both parties intended to settle all issues in dispute so that litigation could be avoided. These negotiations involved back-and-forth discussions during which Walsh expressly told O'Hara that he was dissatisfied with the car, O'Hara standing by his company's reputation and lack of any other complaints from other customers and his desire to have Walsh happy, Walsh's gratefulness that O'Hara handled the dissatisfaction with the refund of $15,000. Walsh accepted the manner in which O'Hara was willing to resolve the dispute through his acceptance.  O'Hara memorialized the essential terms of the settlement in his email to Walsh. The email reads in its relevant part:

> Per our telecon this afternoon, in the interest of your complete satisfaction and preservation of the company's over 20 years of supporting ratings and or feedback I have cleared with accounting to issue a partial refund of your acquisition price in the amount of $15,000.00.

> Walsh replied to Mr. O'Hara's email. Walsh's reply reads:

> Thank you Larry. I genuinely appreciate the professional manner in which you handled this matter. Mr. Walsh admitted in his sworn testimony

Walsh argues, however, that no binding settlement was created on March 8 because there was no meeting of the minds on all the essential terms necessary to resolve the disputed issues, specifically terms relating to payment, rights and obligations, and release. The Court disagrees.

When the parties began settlement negotiations, the disputed issues on the table were the condition and worth of the car. Throughout these negotiations, O'Hara made it clear to Walsh that he wanted Walsh's complete satisfaction and to preserve his company's reputation; and Walsh indicated that he appreciated the professional manner in which O'Hara "handled" the matter, the past tense indicating that the matter had been resolved. At the time, Walsh did not indicate that anything further was necessary. He accepted the $15,000 refund as having "handled" the matter.

"'Any reservation or limitation as to the scope of a settlement agreement must be clearly expressed.'" *Bath Junkie Branson*, 528 F.3d at 562 (quoting *Fiegener v. Freeman-Oak Hill Health Sys.*, 996 S.W.2d 767, 773 (Mo. Ct. App. 1996)). "Therefore, even if a party may have subjectively believed that it had outstanding important contractual terms, a court will still enforce a settlement agreement that the record reflects contains all material terms." *Id*. See also *Biologix Franchise Mktg. Corp. v. Logic*, Case No. 4:18CV00714 AGF, 2020 WL 33108, at *4 (E.D. Mo. Jan. 2, 2020) (where one party may now be unhappy with

11

some or all of the terms, the fact that it decides after the fact that a contract is not to its liking does not provide reason to release it from its obligation).

The settlement agreement reached on March 8 upon Walsh's acceptance of O'Hara's Offer *in toto* contained all the material terms necessary to resolve all issues in dispute between the parties, including what Defendants would pay to Plaintiffs. It was not until a few days after the parties mutually agreed to these terms that Walsh stated that he reconsidered and did not want the $15,000. But the settlement reached on March 8was not ambiguous and did not lack any essential contractual elements. Neither during the course of negotiations nor in its offered terms did Walsh indicate that he intended to limit the settlement to only certain disputes or that he expected to recover monies in addition to what the parties expressly agreed. Walsh has not presented any evidence that O'Hara acquiesced in Walsh's attempt to rescind the settlement. The Court cannot consider what a party "secretly intended or what they might have said if they had decided to further explain their intentions." *Fiegener*, 996 S.W.2d at 773. *See also Bath Junkie Branson*, 528 F.3d at 562 (settlement agreement that contains all of the material terms will still be enforced even if a party may have subjectively believed that there remained outstanding important contractual terms).

The participation in the Court ordered mediation does not in any way support Plaintiffs' position.  Defendants were merely abiding by the Court's order

12

until they could obtain evidence, via Walsh's deposition, that he had accepted the settlement.

Plaintiffs also argue that no enforceable settlement exists here because the parties did not agree to a form of release. Plaintiffs argue that a form of release is material to any settlement agreement, and thus that the absence of such a term here necessarily renders the supposed settlement unenforceable. Plaintiffs' argument is misplaced.

In *Sherrard v. The Boeing Co.,* No. 4:13-CV-1015-CEJ, 2016 WL 3903212 (E.D. Mo. July 19, 2016 there was a purported settlement of a putative class action. In a series of email exchanges, the three named plaintiffs first offered to settle the case in exchange for a sum certain for each plaintiff. Boeing counteroffered with a lesser sum, conditioned on all three plaintiffs accepting, which plaintiffs did. "Apart from accepting the money, the emails did not specify what the plaintiffs would be obligated to do in return." 2016 WL 3903212, at *1. Boeing submitted draft settlement agreements with draft releases, which plaintiffs refused to execute. Plaintiffs moved to enforce the settlement agreement that they claim had been reached with the email exchanges, contending that the emails formed a contract to settle the plaintiffs' claims for equal sums in exchange for a full release of liability and a dismissal with prejudice of all claims. *Id.* at *1-2.

13

The court in *Sherrard* found that a valid settlement had not been reached because, in the context of that case, the form of release was a material term to the settlement contract. Without it, there was no consideration for Boeing. The emails did not include what plaintiffs would give up in exchange for money – plaintiffs merely agreed to accept money from Boeing. The form of release was therefore material to the settlement because it was only the release that constituted what plaintiffs would be giving up in exchange for money. And given that the case was a putative class action that had the potential to involve several known and unknown individual plaintiffs, the form of release with respect to whether the settlement resolved the named plaintiffs' claims, the case, or both was material in the circumstances. But because a release was neither negotiated nor agreed to, there was no settlement given the lack of mutual assent to this material term. 2016 WL 3903212, at *4.

This case is not a class action and involves a husband and wife and sole proprietor business with discrete claims. The uncertainty about the number and scope of claims that could be resolved by this settlement is not present here. Moreover, unlike in *Sherrod*, there was mutual consideration in Defendants' settlement offer and in Plaintiffs' acceptance. In exchange for $15,000, Plaintiffs would give up their right to pursue legal remedies on the contract. Because the March 8, 2016 email exchange reached accord on the material issue of what

14

obligations each side would incur, the resulting Settlement Agreement is valid and enforceable.

Here, O'Hara framed the March 8 email as a confirmation of the parties' oral agreement without qualification or limitation. The email was not framed as merely another step in negotiations, nor did it indicate that continued discussions were necessary on any material terms. The offer contained terms of consideration for both parties, as described above. And Walsh's unequivocal acceptance of the offer did not contain any additional or different terms. No terms were left open or uncertain. "To show a legal, valid settlement agreement, one must prove the essential elements of a contract: offer, acceptance and consideration." *Matthes*, 435 S.W.3d at 107 (internal quotation marks and citation omitted). The absence of a release does not render a settlement agreement unenforceable where the parties contemplate that a release will be signed at a later time. *Id.* Because the March 8 email contains all the essential elements of a contract, includes the *essential* terms necessary to resolve the entirety of the dispute, and is sufficiently definite to enable the Court to give the terms exact meaning, the agreement is valid and enforceable regardless of its lack of an express form of release. *Id.*

Finally, Plaintiff argues that Defendants' post-settlement conduct shows that negotiations were ongoing and thus that there was no earlier meeting of the minds. on this material issue. In the circumstances here, O'Hara negotiated the terms of a

15

settlement. The parties' expressed words and acts at the time show that the March 8 email was actually considered a complete settlement and not merely another step in the negotiations, especially given Walsh's acceptance noting the matter had been "handled." There is no evidence before the Court that Defendants agreed to rescind the agreement, as discussed above.

## Conclusion

"'A mutual agreement is reached when the minds of the contracting parties [ ] meet upon and assent to the same thing in the same sense at the same time....A meeting of the minds occurs when there is a definite offer and an *unequivocal acceptance.*'" *Grant*, 379 S.W.3d at 916 (quoting *Kunzie v. Jack-in-the-Box, Inc.*, 330 S.W.3d 476, 483-84 (Mo. Ct. App. 2010)) (emphasis in *Kunzie*). For the reasons set out above, Defendants have demonstrated by clear, convincing, and satisfactory evidence that the parties entered into a valid and enforceable settlement agreement on March 8, 2016, that settled all issues in dispute upon which this litigation is based. The terms of the settlement are unambiguous. The Court will therefore order enforcement of the March 8, 2016 agreement.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Enforce Settlement Agreement [Doc. No. 67] is **GRANTED.**

**IT IS FURTHER ORDERED** that Defendants' Motion for Judgment on the Pleadings, [Doc. No. 64] is **DENIED as moot**.

**IT IS FURTHER ORDERED** that, in accordance with agreement, Defendants shall make a lump sum payment to Plaintiffs, in the amount of $15,000. This lump sum payment shall be made within thirty (30) days of the date of this Order.

**IT IS FURTHER ORDERED** that within seven (7) days of remitting the the payment, Defendants shall certify to the Court that such payment was made. Upon certification of payment, this case will be dismissed in its entirety with prejudice.

Dated this 9th day of December, 2020.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE